<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| EFRAIN CRUZ,<br><br>     Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br>Acting Commissioner<br>of Social Security,<br><br>     Defendant. | Case No.:  2:17-cv-03983 (PAZ)<br><br>    **OPINION** |

**APPEARANCES:**

AGNES S. WLADYKA
AGNES S. WLADYKA, LLC
1122 ROUTE 22 WEST
MOUNTAINSIDE, N.J.  07092
  On behalf of Plaintiff

THERESA ANN CASEY
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET
6TH FLOOR
PHILADELPHIA, P.A.  19123
  On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

   This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the applications of Plaintiff Efrain Cruz for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.)

and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (42 U.S.C.

§§ 1381, et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge

("ALJ") denying the applications; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commisioner for further proceedings in accordance with the following instructions.

## I.  PROCEDURAL HISTORY

On December 13, 2010, Plaintiff filed applications for DIB and SSI.  (R. 307-17.)[2]  On July 31, 2011, the Commissioner determined that Plaintiff was not disabled and denied the applications.  (R. 120.)   On August 29, 2011, Plaintiff's applications were denied on reconsideration.  (R. 121.)   On November 20, 2012, an ALJ held a hearing on Plaintiff's applications; Plaintiff was represented by counsel at the hearing.  (R. 62-98.)  On December 2, 2012, the ALJ issued a decision denying Plaintiff's applications.  (R. 148-64.)  On June 6, 2014, the Appeals Council granted Plaintiff's request for review, vacated the ALJ's December 2012 decision, and remanded the case to the ALJ.  (R. 165-70.)  On October 31, 2014, the same ALJ held another hearing on Plaintiff's applications; Plaintiff was again represented by counsel.  (R. 33-61.)  On March 27, 2015, the ALJ issued a decision denying Plaintiff's applications.  (R. 14-

---

[1] In March 2018, the U.S. Government Accountability Office informed the President of its determination that Nancy Berryhill had exceeded the time limit under the Federal Vacancies Reform Act of 1998 allowing her to serve as the Acting Commissioner of the Social Security Administration without the nomination of a successor.  Accordingly, Ms. Berryhill stepped down as Acting Commissioner and continued to lead the agency from her title of record as Deputy Commissioner for Operations.  In April 2018, Ms. Berry resumed her role as Acting Commissioner.  *Patterson v. Berryhill*, No. 18-cv-193 (DWA), 2018 U.S. Dist. LEXIS 99486 (W.D. Pa. Jun. 14, 2018); *see* 5 U.S.C. § 3346(a)(2).

[2] "R." refers to the continuous pagination of the administrative record on appeal.  ECF No. 8.

32.)  On May 4, 2017, the Appeals Council denied Plaintiff's request for review (R. 1-6), thereby affirming the ALJ's March 2015 decision as the "final" decision of the Commissioner.  On June 2, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  ECF No. 1.  On April 19, 2018, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 12.[3]  The case was reassigned to the undersigned Magistrate Judge on December 21, 2018.  ECF No. 18.[4]

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority to conduct a plenary review of legal issues decided by the ALJ.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

[4] Plaintiff's DIB application alleges an onset date of April 26, 2004 (R. 307), and his SSI application alleges an onset date of December 31, 2009 (R. 312).  Plaintiff's brief asserts an SSI onset date of April 26, 2004, citing to his DIB applications and the reconsideration denial of DIB application.  ECF No. 17 at 2 (citing R. 307, 122).  However, the reconsideration denial is based on an onset date of December 31, 2009.  Defendant's brief asserts an onset date of December 31, 2009, citing to the ALJ's March 2015 decision.  ECF No. 19 at 2 (citing R. 25.)  Since Plaintiff's brief does not challenge the decision in this regard, the Court decides this case using an alleged onset date of December 31, 2009 for both Plaintiff's DIB and SSI applications.

WL 1509091, at *4 (D.N.J. Mar. 27, 2018).    Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication."  *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016).  The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight."  *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record").  Evidence is not substantial if "it is overwhelmed by other

evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482. Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705. As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016). A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518. In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays. *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000). An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits." *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

### B.    Standard for Awarding Benefits

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than twelve months." 20 C.F.R. §§ 404.1505(a), 416.905(a).[5] An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques. Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a diagnosis, or a medical opinion. *Id*. §§ 404.1521, 416.921.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[6] The claimant bears the burden of proof at Steps One through Four. At Step Five, the burden shifts to the Commissioner. *Id*. §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014). At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or

---

[5] Disability Insurance Benefits (*see* 42 U.S.C. §§ 401, et seq.) and Supplemental Security Income (*see* 42 U.S.C. §§ 1381, et seq.) are separate programs under Title II and Title XVI, respectively, of the Social Security Act. Although they are subject to different qualification requirements, the standard for determining whether a claimant is disabled is the same for both programs. *See Rutherford v. Barnhart*, 399 F.3d 546, 551 n.1 (3d Cir. 2005) (citation omitted). The Court endeavors to provide citations to the applicable regulations for each program but may provide citations only to the disability insurance benefits regulations. *See Carmon v. Barnhart*, 81 F. App'x 410, 411 n.1 (3d Cir. 2003) (explaining that because "[t]he law and regulations governing the determination of disability are the same for both disability insurance benefits and [supplemental security income]," "[w]e provide citations only to the regulations respecting disability insurance benefits").

[6] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

profit. *Id*. §§ 404.1572(a) & (b), 416.972(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe. 20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations.  *Id*. §§ 404.1522, 416.922.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence.  *Id*. §§ 404.1526(b)(2), 416.926(b)(2).  If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months.  *Id*. §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work.  20 C.F.R.

§§ 404.1520(e) & (f), 416.920(e) & (f).  RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date.  In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *Id*. §§ 404.1560, 404.1565, 416.945, 416.960.  If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 C.F.R. §§ 404.1520(g), 416.920(g).  If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations.  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling.  *Id*. §§ 404.1569a(a) & (b), 416.969a(b).  Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing postural or manipulative functions such as reaching, stooping, climbing, crawling, crouching, handling, or fingering; difficulty tolerating environmental or physical features of certain work settings such as

dust or fumes; or difficulty maintaining concentration or understanding detailed instructions. *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience, and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without considering the additional non-exertional or exertional limitations. *Id*. §§ 404.1569a(d), 416.969a(d). If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making. *Id*. §§ 404.1569a(c), 416.969a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was forty-three years old on December 31, 2009 (alleged onset date), and the date last insured was December 31, 2009. (R. 19, 24.) At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 19.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: diabetes mellitus, lesion of the plantar nerve, obstructive sleep apnea, obesity, polysubstance abuse, hypertension, asthma, and anxiety. (R. 20.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 20-21.) At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform less than the full range of sedentary work because he is subject to various exertional and non-exertional

limitations.  (R. 21-23.)  The ALJ also found at Step Four that Plaintiff was unable to perform his past relevant work as a warehouse supervisor and forklift operator.  (R. 24.)  At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 201.19 if Plaintiff had the RFC to perform the full range of sedentary work.  The ALJ also found at Step Five that at least 3 jobs – table worker, scale operator, and preparer – existed in significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC.  (R. 24-25.)  The ALJ concluded that Plaintiff was not disabled from the alleged onset date through March 27, 2015 (decision date).  (R. 25.)

As best the Court can discern from his briefs, Plaintiff contends that the ALJ committed five reversible errors:  (1) at Step Two, the ALJ "ma[d]e[] no mention of plaintiff's kidney condition nor (sic) his obstructive sleep apnea impairments despite evidence in the record of their existence" (ECF No. 17 at 17); (2) at Steps Three and Four, the ALJ "failed to properly assess plaintiff's obesity" (*id*. at 20); (3) at Step Four, the ALJ's assessment of Plaintiff's subjective symptoms is not supported by substantial evidence (*see id*. at 21-24); (4) also at Step Four, the ALJ's RFC finding is not supported by substantial evidence (*id*. at 19, 24-26); and (5) at Step Five, the hypothetical questions presented to the VE do not "accurately portray the claimant's individual physical and mental limitations" (*id*. at 26-27).[7]  Plaintiff asks the Court to reverse and remand for payment or, alternatively, for a new hearing.  (R. 28.)  Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.

---

[7] The Court notes that Plaintiff's fourth and fifth arguments both rely on the same alleged error, that the ALJ's Step Four RFC finding fails to include all credibly established limitations.  *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005).

IV.    **SUMMARY OF RELEVANT EVIDENCE**

A.    **Non-Medical Evidence.**

In December 2010, Plaintiff submitted a Function Report.  He stated that he lived in a

shelter and shared a room with two other people.  The shelter rules required him to leave the

building between the hours of 8am and 4pm at least five days per week.  He did not cook because

there were no cooking facilities in his room; he ate in soup kitchens.  He had no problems tending

to personal care activities.  He used reminders on his phone for his medication.  The shelter rules

required him to sweep or mop once a month for 15-20 minutes.  He found that being near cleaning

supplies triggered his asthma.  He travelled by foot or in free transportation provided by the city.

He shopped in stores for two hours each month for groceries.  He would be able to manage his

finances if he were financially stable.  He watched television in his free time and did not spend

time with others.  He had problems getting along with others because he wanted to be alone.  He

could walk one block before needing to rest for five minutes.  He could not pay attention for very

long and did not finish what he started.  He did not read much and did not follow spoken

instructions well.  He had been fired from a job because of attitude problems.  He did not handle

stress or changes in routine well.  He had anxiety attacks.  He used a cane all the time but could

not remember when it had been prescribed.  (R. 368-75.)

In November 2012, Plaintiff was questioned during the initial hearing by his counsel and

the ALJ.  The ALJ summarized that testimony as follows:

> [T]he claimant testified that he was born in Puerto Rico, is divorced and has three
> adult children.  He lives with his brother and collects welfare.  He is 5'4" and
> weighs 221 pounds; he gained weight over the past two years due to anxiety.  He
> finished the 9th grade and sometimes has trouble with math but can count change.
> He last worked in 2010 and was laid off.  His last job was at a soup kitchen where
> he cooked and supervised people.  Prior to that, he worked in a warehouse as a
> laborer, loading trucks.  He has asthma and diabetes, sleep apnea, anxiety, bipolar
> disorder.  He said that his conditions were uncontrolled even though he took

medication.  Everything bothers him, he argues with everyone, he always wants to
be in charge.  He was fired from jobs because of this.  He is easily offended and
gets angry.  His high blood pressure is controlled.  He takes 18 medications a day
for asthma, high blood pressure, depression and anxiety.  He can only walk two
blocks and stand for ten minutes.  He gets pain in his feet.  He is still using cocaine
once or twice a month, it helps him forget his problems.  He said he "is going to
stop."

(R. 22.)  The Court notes Plaintiff's additional testimony:  at the time of the first ALJ hearing,

Plaintiff was living in the basement of his brother's home; he was diagnosed with asthma and

diabetes in 2001; his diabetes was previously treated with pills, and insulin was added to his

medications in 2012; his diabetes was uncontrolled but his high blood pressure was controlled; his

Medicaid Plan G insurance would not cover a CPAP machine; he was diagnosed as bipolar two

years earlier; Dr. Ponci (sp) prescribed a cane two years ago when Plaintiff experienced pain in

the bottom of his feet and in his toes; his medications were prescribed by Dr. Collins, who has

treated Plaintiff since 2008; he saw Dr. Collins once a month and did not see any other doctors; he

had no side effects from his medications; he prepared his own breakfast, did not eat lunch, and

washed his own dishes; he spent the day on the couch watching television; and he went grocery

shopping and to the laundromat with his brother.  (R. 66-96.)

In October 2014, Plaintiff was questioned during the second hearing by his counsel and the

ALJ.  The ALJ summarized that testimony as follows:

At the hearing the claimant testified that he has depression, diabetes, memory loss,
foot pain, asthma, pain in the tips of his fingers, shaking of his left hand, difficulty
sleeping.  He takes two to three naps a day, makes ER visits for elevated blood
sugar and has not driven since 1998.  He lives with his brother.

(R. 22.)  The Court notes Plaintiff's additional testimony:  he was diagnosed with sleep apnea in

2011 and prescribed a CPAP machine, but he did not fill the prescription because he could not find

a medical supplier that accepted his Medicaid Plan G insurance; his current doctor suggested that

he switch to Horizon or another health plan and undergo another sleep study; and he elevated his

feet when sitting but needed to alternate between sitting and standing every 5-7 minutes.  (R. 38-57.)

### B. __Medical Evidence.__

### 1. __Treating Providers.__

In April 2010, Plaintiff sought emergency treatment at Clara Maass Medical Center (Clara Maass) for hyperglycemia and shoulder strain.  He stated that he had not taken medication for six months because he had no insurance.  (R. 512-20, 818-35.)  In May 2010, Plaintiff was examined Dr. Sina Dalal (family medicine) from Newark Homeless Health Care Project clinic and diagnosed with uncontrolled diabetes, malignant hypertension, and moderate persistent asthma.  She prescribed medications and referred Plaintiff for blood tests.  (R. 549-50, 557-58.)  In June 2010, Plaintiff sought emergency treatment at St. Michael's Medical Center for infected blisters on his feet.  He was diagnosed with a diabetic foot infection, received antibiotics and crutches, and advised to follow up with a podiatrist.  (R. 481-508.)  On July 31, 2010, Plaintiff sought emergency treatment at Clara Maass for heart palpitations and anxiety.  He stated that he had been admitted for psychiatric care the previous week at St. James Hospital.  He also stated that his prescribed medications were stolen, and that his insurer would not refill them until August 11.  He was discharged with 10 Xanax pills.  (R. 521-23, 836-52.)

On August 5, 2010, Plaintiff sought emergency treatment at Clara Maass because he heard voices telling him to kill himself.  He was sent for a psychiatric evaluation and discharged after arrangements were made for outpatient psychiatric care.[8]  (R. 524-26, 853-67.)  In September 2010, Plaintiff returned to Dr. Dalal for refills and advised that he had no insurance.  She refilled his prescriptions and urged Plaintiff to follow-up on the blood tests that she had ordered in May.

---

[8] The record does not include any evidence of outpatient mental health care.

(R. 553, 555.)   In October 2010, Plaintiff sought emergency treatment at Clara Maass for hyperglycemia and a groin infection.  He reported that he had not taken medication for 5-6 weeks because he had no insurance.  The emergency room providers advised that certain of Plaintiff's prescriptions were available for $4 each at Target Pharmacy.  (R. 527-31.)  In November 2010, Dr. Dalal refilled his prescriptions and referred Plaintiff to a psychiatrist to evaluate his depression. (R. 551, 554.)  She also completed an Examination Report in connection with Plaintiff's state welfare benefits and reported that he had uncontrolled diabetes, uncontrolled hypertension, proteinuria, depression, and a history of substance abuse.  He was ambulatory and did not require an assistive device.  Dr. Dalal opined that Plaintiff could not work from November 3, 2010 through May 3, 2011 but was not a likely candidate for SSI.  (R. 532-35.)  In December 2010, Dr. Dalal refilled Plaintiff's prescriptions and urged him to follow-up on the psychiatric referral she had provided the previous month.  (R. 553.)

In January 2011, Plaintiff underwent a sleep study at Clara Maass that revealed severe obstructive sleep apnea, moderate oxygen desaturation, and severe sleep fragmentation.  He was prescribed a CPAP machine and advised to avoid driving and working with extreme attention until full treatment of hypersomnia was complete.  (R. 566-73.)  In February 2011, Dr. Robert D. Collin (internal medicine) from Services of Physician completed an Examination Report and reported that Plaintiff had obstructive sleep apnea, bipolar disorder, suicidal ideations, hypertension, chronic sinusitis, anxiety, and depression.  He was ambulatory and did not require an assistive device.  Dr. Collin opined that Plaintiff had unspecified limited attention, concentration, activities of daily living skills, and social function.  Dr. Collin further opined that Plaintiff could not work from February 25, 2011 through February 24, 2012 and was a likely candidate for SSI.  (R. 577-78.)  Plaintiff's customer history report from One Stop Pharmacy indicates that he had eighteen

separate prescriptions filled each month from July through October 2011. (R. 588.) In November 2011, Dr. Collin completed another Examination Report and opined that Plaintiff could not work from November 22, 2011 through November 21, 2012 and was a likely candidate for SSI. Dr. Collins also opined that Plaintiff could not climb, stoop, bend, or lift. (R. 594-95.)

In January 2012, Plaintiff sought emergency treatment at Clara Maass for chest pain, shortness of breath, and abdominal pain. He was discharged with instructions to follow-up immediately with a cardiologist. Two days later, Plaintiff underwent cardiac catherization. (R. 590-92, 659-98.) In March 2012, Plaintiff sought emergency treatment at Clara Maass for cellulitis and hyperglycemia. He stated that he had not taken any meds for at least one week because of insurance issues. He was discharged with instructions to follow-up with his primary care physician. (R. 597-602, 699-715.) In April 2012, Plaintiff sought emergency treatment for elevated blood sugar, heart palpitations, abdominal pain, and anxiety. He was discharged with instructions to follow-up with his primary care physician. (R. 716-44.) Also in April, Dr. Collins completed another Examination Report and opined that Plaintiff could not work from April 3, 2012 through April 2, 2013 and was a likely candidate for SSI. Dr. Collins also opined that Plaintiff could not stand more than 15 minutes, lift more than 15 pounds, push/pull more than 15 pounds, climb, stoop, or bend. (R. 604-05.) In May 2012, Plaintiff sought emergency treatment at Clara Maass for foot pain. He was diagnosed with a subungual hematoma and discharged. (R. 745-49.) In August 2012, Plaintiff was evaluated by Dr. Muyiwa Okuribido (podiatrist) from Newark Community Health Center (NCHC). Plaintiff complained about numbness and burning in his feet. Dr. Okuribido diagnosed Plaintiff with plantar nerve lesion and prescribed medication and orthopedic shoes. (R. 626-27.)

In April 2013, Plaintiff was hospitalized after he overdosed on Xanax and stated during triage that he wanted to hurt himself. He subsequently stated that he had no intention of hurting himself and just wanted to get a good amount of sleep. He was diagnosed with major depression with anxiety, cocaine abuse, and borderline personality disorder. He was also diagnosed with hyperglycemia. He was discharged with instructions to follow up with Sunrise Care for mental health and substance abuse treatment.[9] (R. 750-87). In May 2013, Plaintiff sought emergency treatment at Clara Maass for suicidal thoughts and thoughts of hurting his family members. He was diagnosed in the emergency department with psychosis and substance abuse, and he was sent for a psychiatric evaluation. He was discharged with instructions to follow-up with his primary care physician, and he was also encouraged to seek mental health and substance abuse treatment. (R. 788-817.) From June 23 to July 13, 2013, Plaintiff was hospitalized for psychiatric decompensation after putting a cutter to his throat and overdosing on Seroquel. He was discharged with instructions to follow up with Mount Carmel Guild Behavioral Health for mental health and substance abuse treatment.[10] (R. 868-912.)

In February 2014, Plaintiff was evaluated by Dr. Rommel Montilus (internal medicine) at NCHC. Plaintiff stated that he needed prescription refills since his primary care provider had recently retired. Dr. Montilus instructed Plaintiff to seek emergency treatment, because Plaintiff presented with symptoms of ketonuria. Dr. Montilus also prescribed refills and provided referrals for endocrinology, pain management, and psychiatry. (R. 633-36.) In April 2014, Sheila Santiago (nurse practitioner) from NCHC noted that Plaintiff had not gone to the emergency room as directed during his last appointment, and that Plaintiff was confused regarding his medications.

---

[9] The record does not include any evidence from Sunrise Care.

[10] The record does not include any evidence from Mount Carmel Guild Behavioral Health.

Ms. Santiago prescribed refills and provided referrals for nutrition, optometry, and podiatry.  (R. 639-41.)  Also in April 2014, Plaintiff saw Dr. Okuribido; the treatment notes are similar to August 2013.  (R. 628-29.)  In May 2014, Plaintiff saw Ms. Santiago for medication refills.  (R. 613-15.)  Also in May, Ms. Santiago completed an Examination Report and reported that Plaintiff had uncontrolled diabetes, obesity, obesity, chronic pain syndrome, and bipolar disorder.  Plaintiff was ambulatory but used a cane.  Ms. Santiago opined that Plaintiff had unspecified limitations in climbing, stooping, bending, and lifting.  She further opined that Plaintiff could not work from May 30, 2014 through May 30, 2015 and was a likely candidate for SSI.  (R. 617-18.)  In July and August 2014, Plaintiff saw Dr. Okuribido.  At both appointments, Plaintiff ambulated with a cane and stated that his insurance would not pay for Lyrica, and that he could not afford to get Vitamin B6.  (R. 630-32.)  Also in July and August, Plaintiff saw Dr. Montilus and Ms. Santiago for refills; he was diagnosed with chronic pain syndrome in August.  (R. 642-48.)  In September 2014, Plaintiff advised Dr. Stacy Reed-Mevs (family medicine) from NCHC that he had seen an endocrinologist at Clara Maass who changed his insulin regimen.  (R. 649-50.)  In October 2014, Plaintiff saw Ms. Santiago for refills.  (R. 653-54.)  During all his 2014 appointments at NCHC, Plaintiff consistently denied having any ongoing symptoms of depression.  He also denied any drug or alcohol use over the preceding year.  (R. 23.)  Also in October 2014, Plaintiff sought emergency treatment at Clara Maass for chest pain and hyperglycemia.  (R. 619-25, 913-52.)

In January 2015, Plaintiff underwent a sleep study and was diagnosed with severe obstructive sleep apnea.  He was prescribed a CPAP machine and instructed to avoid activities that require vigilance until his sleep disordered breathing was adequately treated.  (R. 970-74).  In February 2015, Plaintiff underwent pulmonary testing that revealed:  no evidence of lung dysfunction; insignificant response to bronchodilators; mild restrictive lung defect; evidence of

significant air trapping; and mild decrease in diffusing capacity. (R. 977-81.) In March 2015, Plaintiff underwent CPAP titration and was advised to avoid driving or engaging in other activities requiring sustained vigilance pending successful treatment of his sleep pathology. (R. 985-90.) Also in March, chest x-rays revealed no evidence of acute pulmonary disease. (R. 991.)

**2.    Consultative Examiner.**

In January 2011, Plaintiff underwent a consultative psychological evaluation by Dr. Kim Arrington (psychologist). Plaintiff stated that he had been homeless until August 2010, when he had moved into a shelter. He reported mood-related, anxiety-related, and panic attack symptoms. He also reported that he first used cocaine at age 14 and crack cocaine at age 20, and that he last used crack cocaine the previous day. He previously had an alcohol problem but stopped drinking heavily 10 years ago. He further reported that he can dress, bathe, and groom himself independently; he has some cleaning chores at the shelter; he volunteers at and attends a soup kitchen; he can travel independently; and he has difficulty managing money because he spends it too quickly. Mental status examination findings included: cooperative demeanor and responsiveness; adequate manner of relating, social skills, and overall presentation; fair hygiene and grooming; normal gait and posture; restless motor behavior; coherent thought processes with no evidence of hallucinations, delusions, or paranoia; restricted affect; dysthymic mood; mildly impaired attention and concentration; mildly impaired recent and remote memory skills; low average range intellectual functioning. Dr. Arrington diagnosed cocaine dependence, substance-induced mood disorder, rule out posttraumatic stress disorder, and alcohol dependence in remission. (R. 562-65.) The Court discusses Dr. Arrington's opinion in Section V.D.1. below.

### 3.     State Agency Reviewing Consultants.

In January 2011, State Agency reviewing consultants opined that Plaintiff's diabetes, hypertension, and asthma were not severe, but that his anxiety and substance addiction were severe.  As to his mental impairments, the reviewing consultants opined that Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  (R. 99-108.)

In August 2011, State Agency reviewing consultants opined on reconsideration that Plaintiff's diabetes and hypertension were not severe but that his sleep-related breathing disorder, anxiety, and substance addiction were severe.  The reviewing consultants opined that Plaintiff: could frequently lift/carry up to 10 pounds; occasionally lift/carry up to 20 pounds; stand and/or walk up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and must avoid concentrated exposure to extreme cold, heat, wetness, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards.  As to Plaintiff's mental impairments, the reviewing consultants agreed with their colleagues' initial opinions from January 2011.  (R. 122-33.)

## V.     DISCUSSION

### A.     Step Two.

Plaintiff argues that "the Administrative Law Judge makes no mention of plaintiff's kidney condition nor his obstructive sleep apnea impairments despite evidence in the record of their existence."  ECF No. 17 at 17 (record citations omitted); *see* ECF No. 20 at 1.  Plaintiff is correct regarding his alleged kidney impairment but incorrect regarding his obstructive sleep apnea. Indeed, as Plaintiff recites in his brief, the ALJ found at Step Two that "plaintiff had severe impairments including diabetes mellitus, lesion of the plantar nerve[,] obstructive sleep apnea,

polysubstance abuse, hypertension, asthma, and anxiety." *Id.* (citing R. 20). The Court need not decide whether Plaintiff's alleged kidney impairment was severe because the ALJ ultimately found in Plaintiff's favor at Step Two. Thus, "even if [the ALJ] had erroneously concluded that some of [Plaintiff's] other impairments were non-severe, any error was harmless." *Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007); *see Rivera v. Comm'r of Soc. Sec.*, 164 F. App'x 260, 261 n.2 (3d Cir. 2006) (same). Plaintiff also argues that his "kidney severity is relevant later in the process" because the ALJ must consider all medically determinable impairments, regardless of their severity, at Steps Three through Five. ECF No. 20 at 2; *see* 20 C.F.R. § 404.1523(c) (after finding at least one severe impairment at Step Two, ALJ must consider all impairments – severe and non-severe – in remaining steps of sequential inquiry). The Court also finds that any error regarding Plaintiff's alleged kidney impairment at Steps Three and Four was harmless because Plaintiff points to no evidence that the ALJ inevitably would have concluded that Plaintiff meets or medically equals a Listing or would have crafted a more restrictive RFC finding. *See Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766-67 (3d Cir. 2016).[11]

## B. Obesity.

At Step Two, the ALJ found that obesity was one of Plaintiff's severe impairments. Plaintiff argues that the ALJ committed reversible error at Step Three by failing to consider Plaintiff's obesity when analyzing the Listings.[12] Plaintiff also argues that the ALJ committed

---

[11] Plaintiff points only to a February 2008 renal ultrasound that revealed evidence of caliectasis on the right kidney consistent with hydro-nephrosis when Plaintiff had a urinary tract infection. (R. 466-80.)

[12] Plaintiff does not dispute any other aspect of the ALJ's Step Three finding that "[n]o treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs of findings that are the same or equivalent to those of any listed impairment." (R. 20.) As to Plaintiff's diabetes mellitus, lesion of the plantar nerve, obstructive sleep apnea, polysubstance abuse, hypertension, and asthma, the ALJ gave "[p]articular scrutiny" to Listing Sections 1.00 [Musculoskeletal System], 3.00 [Respiratory Disorders], 4.00 [Cardiovascular System], and 9.00 [Endocrine Disorders]." (R. 20.) As to Plaintiff's anxiety, the ALJ found that Plaintiff did not meet the

reversible error at Step Four by failing to consider Plaintiff's obesity when crafting the RFC finding.

### 1.    Step Three.

Social Security Ruling 02-1p provides explicit instruction for considering obesity at Step Three.  *See* S.S.R. 02-1p, *Titles II & XVI: Evaluation of Obesity*, 2002 WL 34686281 (S.S.A. Sep. 12, 2002)).  The ALJ must determine whether the claimant's obesity by itself is *medically equivalent* to any Listing.  For example, if the obesity results in an inability to ambulate effectively, it can substitute for the criteria of Listing 1.02A (Major Dysfunction of a Joint) – which requires a major dysfunction of one major peripheral weight-bearing joint that results in the inability to ambulate effectively.  S.S.R. 02-1p, 2002 WL 34686281, at *5.  The ALJ must also determine whether obesity, in combination with any of the claimant's other impairments, *meets* any Listing. For example, obesity can satisfy the physical impairment criterion for Listing 12.05C (Intellectual Disability) – which requires both a specific IQ range and a physical or mental impairment that imposes an additional and significant work-related limitation of function.  *Id.*  The ALJ must further determine whether obesity, in combination with any of the claimant's other impairments, is *medically equivalent* to any Listing.  For example, because obesity increases the resting workload of the cardiovascular and respiratory systems, the combination of a cardiovascular or respiratory impairment and obesity may have signs, symptoms, and laboratory findings that are of equal medical significance to Listings 4.00 et seq. (Cardiovascular System) or Listings 3.00 et seq. (Respiratory Disorders).  *Id.*

---

paragraph B criteria for Listings 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), and 12.09 (Substance Addition Disorders) because Plaintiff had no episodes of decompensation of extended duration, and moderate limitations in activities of daily living, social functioning, and concentration, persistence, or pace.  (R. 20-21.)

At Step Three, the ALJ stated: "Any functional limitations resulting from the claimant's obesity were considered in the residual functional assessment, in addition to any limitations resulting from the claimant's other physical impairments (Social Security Ruling 02-1p)." (R. 20.) This statement is problematic in two respects. First, the Court cannot confirm that the ALJ applied at Step Three the analytical framework set forth in Social Security Ruling 02-1p. Second, even if Social Security Ruling 02-1p were properly applied, the Court could not meaningfully review the ALJ's analysis. There is no explanation for the ALJ's implicit findings that Plaintiff's obesity by itself was not medically equivalent to any Listing; that Plaintiff's obesity in combination with his other impairments did not meet any Listing; or that Plaintiff's combined impairments were not medically equivalent to any Listing. The Court therefore finds that the ALJ erred at Step Three as to Plaintiff's obesity. *See Gullace v. Colvin*, No. 15-cv-7630 (FLW), 2017 WL 714356, at *9 (D.N.J. Feb. 23, 2017) (ALJ erred by "not adequately explain[ing] his consideration of Plaintiff's obesity in connection with the step three analysis").

Nevertheless, remand is warranted only if the ALJ's error was not harmless. *See Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("[A] remand is not required here because it would not affect the outcome of the case."). Plaintiff bears the burden of explaining how a more detailed analysis of his obesity "would lead to the conclusion that he was disabled at step three." *Woodson*, 661 F. App'x at 766 (plaintiff must "explain[] how, even if the ALJ's analysis was lacking, the deficiency was harmful to [her/]his claims," including "affirmatively point[ing] to specific evidence that demonstrates [s/]he should succeed"); *Gullace*, 2017 WL 714356, at *10 (citing *Woodson*). Plaintiff offers no argument that his obesity during the relevant period (by itself) is medically equivalent to any specific Listing, nor does he explain with citation to record evidence why his obesity during the relevant period (in combination with other

23

impairments) meets or is medically equivalent to any specific Listing.  The Court therefore finds that remand is not warranted because the error in the ALJ's obesity analysis at Step Three was harmless.  *See*, *e.g.*, *Woodson*, 661 F. App'x at 766 (affirming Step Three finding where claimant "only says in very vague terms that an actual discussion of his impairments would lead to the conclusion that he was disabled at step three") (citations omitted); *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (no basis for remanding case even if Step Three analysis were deficient where claimant complained "in vague terms that certain impairments were not properly compared, separately and in combination, to the listings" without identifying "specific avenues for meeting or equaling specific listings that the ALJ should have considered but did not").[13]

### 2.    Step Four.

Social Security Ruling 02-1p also provides explicit instruction for considering obesity at Step Four when assessing a claimant's RFC:

> Obesity can cause limitation of function.  The functions likely to be limited depend on many factors, including where the excess weight is carried.  An individual may have limitations in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  It may also affect ability to do postural functions, such as climbing, balance, stooping, and crouching.  The ability to manipulate may be affected by the presence of adipose (fatty) tissue in the hands and fingers.  The ability to tolerate extreme heat, humidity, or hazards may also be affected.
>
> The effects of obesity may not be obvious.  For example, some people with obesity also have sleep apnea.  This can lead to drowsiness and lack of mental clarity during the day.  Obesity may also affect an individual's social functioning.
>
> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment.  Individuals with obesity may have problems with the ability to sustain a function over time.  As explained in SSR 96-8p ("Titles II and XVI:

---

[13] Since the Court ultimately concludes below that remand is warranted, the ALJ is urged at Step Three on remand to apply Social Security Ruling 02-1p as to Plaintiff's obesity.

Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

S.S.R. 02-1p, 2002 WL 34686281, at *6.

As noted above, the ALJ stated at Step Three that "[a]ny functional limitations resulting from the claimant's obesity were considered in the residual functional assessment, in addition to any limitations resulting from the claimant's other physical impairments (Social Security Ruling 02-1p)." (R. 20.) The Step Four section of the ALJ's decision does not include the word obesity or otherwise reference Plaintiff's weight, but it does state that "[a]ll of the prior [December 2012] decision is incorporated by reference herein except for the B criteria findings concerning the mental health impairments and the non-exertional limitations in the residual functional capacity of this finding." (R. 22.) At Step Four of the December 2012 decision, the ALJ found that Plaintiff's complaints about his shortness of breath and blisters on his feet "*combined with his obesity*, would reasonably limit him to sedentary work." (R. 156 (emphasis added).) The Court cannot conclude that substantial evidence supports the ALJ's decision that Plaintiff's obesity limits him only to the exertional limitations of sedentary work. It is unclear if the ALJ considered whether Plaintiff's obesity results in any additional exertional limitations or any non-exertional limitations. Nevertheless, the Court finds that the ALJ's error is harmless. Plaintiff implicitly assumes that his functional capabilities are adversely affected by his obesity. This unfounded assumption fails to meet his burden of demonstrating that greater consideration of Plaintiff's obesity inevitably would have led the ALJ to craft a more restrictive RFC finding. *See Woodson*, 661 F. App'x at 766 (harmless error where claimant "only says in very vague terms that an actual discussion of his

impairments would lead to the conclusion that he was disabled").  Plaintiff points to no evidence that his obesity resulted in additional exertional limitations or any non-exertional limitations.  In fact, his medical records reflect a contrary conclusion; none of Plaintiff's treating physicians found that his obesity burdened his ability to perform activities, work or otherwise.  *Gullace*, 2017 WL 714356, at *10 (harmless error where plaintiff "has merely offered a generalized response" as to functional limitations attributable to his weight).[14]

    **C.**    **Step Four – Subjective Symptoms.**

"Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make."  *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)); *see Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."); *Izzo v. Comm'r of Soc. Sec.*, 186 F. App'x 280, 286 (3d Cir. 2006) ("a reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness").  The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process.  First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that reasonably could produce the alleged symptoms, including pain.  Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms by determining if they are supported by objective medical evidence.  If not, the ALJ must consider other factors, including:  (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of

---

[14] Since the Court ultimately concludes below that remand is warranted, the ALJ is urged at Step Four on remand to apply Social Security Ruling 02-1p as to Plaintiff's obesity.

the claimant's symptoms; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any other measures other than treatment the individual uses or has used to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to symptoms.  20 C.F.R. § 404.1529; *see* Social Security Ruling 96-7p, *Titles II & XVI:  Evaluation of Symptoms in Disability Claims:  Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).[15]

At Step Four, the ALJ recited the two-step process above and found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision."  (R. 22.)  Plaintiff contends that the ALJ committed reversible error in assessing his subjective symptoms, including his pain levels.  Plaintiff's supporting analysis is spread over five pages in his brief and intermixed with unrelated facts and legal issues.  *See* ECF No. 17 at 19-24.  He appears to argue that the ALJ erred by discounting Plaintiff's subjective symptoms because "[the ALJ] failed in his duty to investigate all possible reasons for plaintiff's alleged noncompliance with a prescribed course of treatment."  (R. 19-20).

The ALJ found that Plaintiff's "poorly controlled conditions must be viewed in context with his non-compliance and continued use of drugs."  (R. 23; *see id*. ("As noted, [Plaintiff] has not followed through with prescriptions to alleviate his condition.").)  As to the former, the ALJ

---

[15] Although Social Security Ruling 96-7p has been superseded, the Ruling still applies to decisions that were made prior to March 28, 2016.

specifically cited Plaintiff's failures to follow-up with various referrals, maintain a regimen of 18

medications, keep a log of his blood sugar levels, and fill his orthotic prescription.  Social Security

Ruling 96-7p provides:

> [T]he individual's statements may be less credible if the level or frequency of
> treatment is inconsistent with the level of complaints, or if the medical reports or
> records show that the individual is not following the treatment as prescribed and
> there are no good reasons for this failure.  However, the adjudicator must not draw
> any inferences about an individual's symptoms and their functional effects from a
> failure to seek or pursue regular medical treatment without first considering any
> explanations that the individual may provide, or other information in the case
> record, that may explain infrequent or irregular medical visits or failure to seek
> medical treatment.

S.S.R. 96-7p, 1996 WL 374186, at *7 (noting that uch explanations or information include that the

"individual may not be able to afford treatment and may not have access to free or low-cost medical

services").  Thus, "[t]he ALJ should have considered Plaintiff's inability to afford treatment …

when making a credibility finding concerning Plaintiff's testimony about his untreated

impairments."  *Figueroa v. Comm'r of Soc. Sec.*, No. 17-cv-8239 (JLL), 2018 WL 6918869, at *5

(D.N.J. Dec. 28, 2018).  The ALJ's decision referenced the refusal by Plaintiff's insurer in 2014

to pay for Lyrica, but the ALJ did not consider that evidence pursuant to Social Security Ruling

96-7p.  Nor did the ALJ reference or consider Plaintiff's consistent statements to his treating

providers since 2010 that he lacked insurance for and/or was unable to afford his prescribed

treatment – including insulin and other diabetes medications, a CPAP machine, and the equipment

necessary to monitor his blood sugar levels at home.[16]  Since it is unclear how heavily the ALJ

---

[16] As noted above, the ALJ's decision states that "[a]ll of the prior [December 2012] decision is incorporated
by reference herein except for the B criteria findings concerning the mental health impairments and the
non-exertional limitations in the residual functional capacity of this finding."  (R. 22.)  At Step Four of the
December 2012 decision, the ALJ also found that Plaintiff's "poorly controlled conditions must be viewed
in content with his non-compliance and continued use of drugs."  (R. 157.)  The ALJ stated that Plaintiff
"consistently reported not renewing his medications and not taking his blood sugar readings, despite the
fact that medications and assistance were readily available through the clinic."  (R. 157 (no record citation

relied on the non-compliance finding in assessing Plaintiff's subjective symptoms, the Court cannot meaningfully review the assessment. The Court therefore finds that remand is warranted in this regard. *See Newell*, 347 F.3d at 547 (when plaintiff alleged inability to afford treatment, ALJ erred in using lack of treatment as basis for discrediting credibility); *Torres v. Comm'r of Soc. Sec.*, No. 15-6344, 2016 WL 5339724, at *5 (D.N.J. Sept. 23, 2016) (finding an ALJ's "failure to consider [the plaintiff's] ability to afford medical treatment constitute[d] error warranting remand" where the "ALJ's credibility determination had a significant impact on the RFC analysis"); *Vaneman v. Comm'r of Soc. Sec.*, No. 04-4687, 2009 WL 2143649, at *11 (D.N.J. July 14, 2009) ("The ALJ erred by concluding that Plaintiffs description of her disabling pain lacks credibility because he failed to consider Plaintiff's claimed inability to afford treatment.").

    **D.**    **Step Four – RFC Finding.**

    Also at Step Four, the ALJ found that Plaintiff had the RFC to perform less than the full range of sedentary work because:

> He is able to lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; able to stand and[/]or walk up to two hours and to sit at least six hours out of an eight-hour workday. He must avoid concentrated exposure to wetness, humidity, hazards, dust, fumes and other pulmonary irritants. He is able to understand, remember and carry out simple instructions; can handle only occasional changes to essential job functions.

(R. 21.) Plaintiff contends that the ALJ committed reversible error "by failing to properly assess the Plaintiff's residual functional capacity." ECF No. 17 at 24. As best the Court can discern, Plaintiff's challenge to the ALJ's RFC finding is twofold. First, Plaintiff argues that the ALJ erred

---

provided); *see* R. 156 ("Doctors informed [Plaintiff] that he could get medications through the clinic.") (citing Exhibit 6F).) The Court observes that Exhibit 6F (R. 536-61) consists of treatment notes from the Newark Homeless Health Care Project clinic, including copies of prescriptions. There is no indication in Exhibit 6F, or elsewhere in the record, that Plaintiff was advised he could obtain free prescription medication and supplies – let alone that such advice was accurate.

in assessing the medical opinion evidence. ECF No. 17 at 19, 21-22, 25-26; ECF No. 20 at 2-3.

Second, Plaintiff argues that the ALJ erred by finding that Plaintiff: (a) was not limited because

of his uncontrolled obstructive sleep apnea (ECF No. 17 at 18); (b) did not require a cane to

ambulate (ECF No. 17 at 26-27; ECF No. 20 at 4); and (c) was not restricted to occasional bilateral

fingering and handling (ECF No. 17 at 27; ECF No. 20 at 4-5).

### 1.    Medical Opinions.

Plaintiff first argues that the ALJ erred by ascribing "no weight" to the Examination

Reports completed by Plaintiff's treating physicians who opined that he was unable to work. (R.

23, 157.) As the ALJ explained, the Reports were prepared for purposes of evaluating Plaintiff's

entitlement to state welfare benefits, and they fail either to opine regarding specific functional

limitations or to cite objective medical evidence beyond mere diagnoses. Moreover, a treating

physician "opinion" that the claimant is disabled and unable to work can never be given controlling

weight, because that is an administrative finding reserved to the Commissioner. 20 C.F.R. §§

404.1527(d), 416.927(d). The Court therefore finds no error in the ALJ's assessment of the

Examination Reports.

Plaintiff next argues that the ALJ erroneously discounted Dr. Arrington's opinion from the

consultative examination. Dr. Arrington opined:

> Vocationally, the claimant is able to follow and understand simple directions and
> instructions. He is struggling to maintain attention and concentration. Nonetheless,
> he is able to perform many simple tasks independently. He will have some mild
> difficulty learning new tasks and performing complex tasks independently. He will
> be able to maintain a regular schedule. His difficulties appear attributable to
> substance abuse, depression and anxiety. The results of the present evaluation
> appear to be consistent with psychiatric problems, which may significantly interfere
> with the claimant's ability to function on a daily basis.
>
> ***
>
> It is recommended that the claimant enter a MICA treatment program. His
> prognosis is guarded, and it is hoped that with continued intervention and support,
> he will find symptom relief and maximize his abilities.

(R. 562-65.)   In the ALJ's 2012 decision, the ALJ ascribed "considerable weight" to Dr. Arrington's opinion because it "is consistent with the ability to perform simple, repetitive work and there is no evidence to contradict this finding."  (R. 157.)  The RFC finding in the ALJ's 2015 decision limits Plaintiffs to simple instructions and only occasional changes to essential job functions.  The Court finds that these limitations are consistent with Dr. Arrington's opinion that Plaintiff can "follow and understand simple directions and instructions," can "maintain a regular schedule," and has "some mild difficulty learning new tasks."  Plaintiff relies heavily on Dr. Arrington's note that "[t]he results of the present evaluation appear to be consistent with psychiatric problems, which may significantly interfere with the claimant's ability to function on a daily basis."   But Dr. Arrington did not opine as to specific functional limitations, and Plaintiff points to no limitation in the decisional RFC finding that conflicts with Dr. Arrington's report. The Court therefore finds no error in the ALJ's assessment of Dr. Arrington's opinion.

Plaintiff finally argues that the ALJ erred by not adopting all the restrictions opined by the State Agency reviewing consultants.   The ALJ ascribed "great weight" to the reviewing consultants' opinion that Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation of extended duration.  (R. 22.) Plaintiff points to the reviewing consultants' opinion:  that Plaintiff is "moderately limited" in the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. However, Plaintiff ignores that the reviewing consultants concluded – notwithstanding the

moderate limitations listed above – that Plaintiff's mental RFC assessment was as follows: "He is indep[endent] in adls [activities of daily living] and can relate/adapt. Cl[aimant] retains his ability to underst[and]/remem[ber]/execute 2 step instructions for simple tasks." (R. 99-108.)   As with Dr. Arrington's opinion, the Court finds that the RFC finding in the ALJ's 2015 decision is consistent with the reviewing consultants' evaluation. The Court therefore finds no error in the ALJ's assessment of the reviewing consultants' opinions.

### 2.    Additional Limitations.

The Court agrees with Plaintiff that the ALJ committed reversible error as RFC limitations regarding his uncontrolled obstructive sleep apnea. However, the Court disagrees with Plaintiff's arguments that substantial evidence supports RFC limitations regarding his use of a cane and his fingering and handling abilities.

First, the ALJ's decision did not discuss that Plaintiff's treating providers for his 2011 and 2015 sleep studies both advised that he avoid certain activities until his obstructive apnea was controlled. The Court cannot meaningfully review the RFC finding in this regard because it is unclear whether (and if so, how) the ALJ considered this evidence.

Second, the ALJ was required to consider Plaintiff's cane in crafting the RFC finding only if the device was medically required. As instructed in Social Security Ruling 96-9p:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case.

S.S.R. 96-9p, *Titles II & XVI: Determining Capability To Do Other Work – Implications Of A Residual Functional Capacity For Less Than A Full Range Of Sedentary Work*, 1996 WL 374185, at *7 (S.S.A. Jul. 2, 1996); *cf. Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (insufficient

evidence that physician-prescribed cane was medically required absent physician's discussion of medical necessity) (citing S.S.R. 96-9p).  Although Plaintiff alleges that the cane was prescribed by a physician, he cannot recall the physician's name or when the prescription was written.  There is no record evidence of such prescription.  Moreover, there is no record evidence that Plaintiff used the cane during the relevant period until 2014, and no medical professional – treating provider, consultative examiner, or reviewing consultant – opined that Plaintiff required a cane during the relevant period.  The Court therefore finds that substantial evidence supports the RFC finding in this regard.

Third, the ALJ noted that "[n]o mention was ever made of any hand shaking or fingertip pain as alleged at the hearing."  (R. 23.)  Plaintiff does not point to – and the Court has not found – any record evidence that Plaintiff ever complained to or was treated by a medical professional for issues with his hands and fingers.  The Court further finds that substantial evidence supports the RFC finding in this regard.

## VI.    CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions and the accompanying Order.


Dated:   June 17, 2019                          _____s/ Paul A. Zoss_____
At Newark, New Jersey                    PAUL A. ZOSS, U.S.M.J.